# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROGER T. BROADDUS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 15-cv-1339-SCW |
| | ) |
| WEXFORD HEALTH SOURCES, INC. | ) |
| and SUSAN KERR, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**WILLIAMS, Magistrate Judge:**

### I. INTRODUCTION

*Pro se* Plaintiff Roger Broaddus is a former inmate incarcerated with the Illinois Department of Corrections ("IDOC"). He brought the present lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights while he was incarcerated. He alleges his rights were violated regarding medical treatment for a hernia from which he suffered at the time. Plaintiff alleges that Defendant Kerr ignored his complaints relating to the course of treatment for the hernia, and also alleges that Defendant Wexford, the medical provider for IDOC, had a policy of not approving surgeries in order to save costs. This matter is before the Court on two motions for summary judgment filed by Defendants (Docs. 47, 55). As discussed below, the Court finds that an unconstitutional practice by Wexford could be reasonably inferred, and its motion is **DENIED**. Since Defendant Kerr, however, bore no personal responsibility for Plaintiff's

harm, her motion is **GRANTED**.

## II. BACKGROUND

At all times relevant to this suit, Plaintiff was an inmate incarcerated by the Illinois Department of Corrections ("IDOC") at either Big Muddy Correctional Center ("Big Muddy") or Robinson Correctional Center ("Robinson"). (Doc. 1). Plaintiff first noticed his hernia in January or February of 2009. (Doc. 48-4, p. 5). In 2009, Plaintiff saw his primary care physician, a non-Wexford physician, regarding his hernia, and his physician indicated that surgery to repair the hernia was elective. (*Id.* at 14). Since Plaintiff did not have health insurance, he did not elect to have surgery at that time. (*Id.*). When Plaintiff had insurance in February 2010, he elected to have the surgery. (*Id.*). His doctor, however, found that Plaintiff had a heart flutter, told Plaintiff that the surgery would not be performed, and sent Plaintiff to the hospital in an ambulance. (*Id.*).

After he was incarcerated at Big Muddy, Plaintiff was seen by Dr. Larson, a Wexford doctor, on September 18, 2010 for complaints of a right inguinal hernia that had been present for two years, but that reduced when he laid down. (Doc. 48-2, p. 2) Plaintiff complained of occasional straining while using the bathroom. (*Id.*). His vital signs were stable and he appeared in no apparent distress. (*Id.*). Dr. Larson diagnosed Plaintiff with an uncomplicated, easily reducible right inguinal hernia and decided to implement a "Watchful Waiting" protocol. (*Id.*) According to Dr. Larson, "Watchful Waiting" is a term used by physicians who chose to implement a continuing monitoring protocol with patients diagnosed with uncomplicated hernias that are not painful and

present no health risk to the patient. (*Id.*).

From January 3, 2011 to November 16, 2012, Plaintiff presented to a healthcare provider regarding his hernia at least 20 times. (*See Id.* at 3 – 9; Doc. 48-3, p. 1 – 2). During some visits at various times during this period Plaintiff complained of pain associated with his hernia, and on at least one occasion he reported nausea. With each visit, Plaintiff's hernia was ultimately reduced, and was easily reduced on most occasions. In addition, on January 17, 2011, Plaintiff was provided with a hernia belt for support. (Doc. 48-2, p. 3). Also during this time, on September 19, 2012, Plaintiff was transferred from Big Muddy Correctional Center to Robinson Correctional Center ("Robinson"). (Doc. 48-3, p. 2).

On November 21, 2012, physicians Loftin and Haymes participated in a collegial review regarding referring Plaintiff for an evaluation of a surgical repair of his hernia. (*Id.* at 2 – 3). According to Dr. Shah, these doctors discussed that Plaintiff had a right inguinal hernia the size of a tennis ball or a softball, and that Plaintiff complained of worsening pain. (*Id.* at 3). The doctors also discussed that the hernia could be reduced if Plaintiff was relaxed with his legs slightly bent. (*Id.*). The doctors decided on an alternative treatment method in favor of conservative on-site management. (*Id.*).

From November 28, 2012 to February 20, 2013 Plaintiff presented to healthcare providers for his hernia three more times. (*See id.* at 3 – 4). During this time Plaintiff complained that his hernia had been "popping out" more frequently, he became nauseated, and Dr. Loftin noted the hernia was slower to reduce. (*Id.* at 3). On February 27, 2013, Dr. Loftin and Dr. Garcia discussed Plaintiff's hernia during a

collegial, and Plaintiff was approved for a surgical evaluation of his hernia. (*Id.* at 4).

On March 21, 2013, Plaintiff was seen at Carle Hospital for a surgical consultation with Dr. Kimberly Cradock. Plaintiff reported that while his hernia used to spontaneously reduce, it did not do so any longer. (*Id.* at 4). He complained of pain in his right groin which was exacerbated with motion and coughing. (*Id.*). Plaintiff stated that his hernia sometimes reduced on its own when he laid supine at night, but that it would take the hernia 45 minutes to reduce and had negligible effect on his pain. The doctor noted the possibility that Plaintiff had a left inguinal hernia as well. (*Id.*). She also noted that Plaintiff's hernia was completely reducible. (*Id.*). Dr. Cradock's recommendation was to perform a laparoscopic right inguinal hernia repair, as well as, possibly, a left inguinal hernia repair. (Doc. 48-1, p. 61). Though Dr. Cradock recommended surgery, on March 27, 2013, Drs. Loftin and Haymes denied approval for a surgery, noting that Plaintiff's hernia was fully reducible during his visit with the surgeon. (Doc. 48-3, p. 5). The doctors decided to continue following Plaintiff's care on-site. (*Id.*).

Roughly a month later, on April 29, 2013, Plaintiff presented to a nurse with complaints of his hernia not reducing. The nurse observed that Plaintiff's right testicle was red and swollen. (*Id.*). He was placed on a bed, and his hernia was reduced in 30 minutes. (*Id.*). On the same evening, Plaintiff complained to a nurse that the area around his hernia was sore where it was put back in, and that he was sore more than usual. (*Id.*). The nurse explained that Plaintiff's hernia was not currently strangulated, but made sure he understood the signs and symptoms of a strangulated hernia so that

he could come to the healthcare unit if such symptoms arose. (*Id.*).

On May 3, 2013, a "code 3" medical emergency was called to Plaintiff's housing unit. Plaintiff complained that his hernia was out and was too sore to push back in. (*Id.*). He indicated that his hernia had been worse for the previous three weeks and that it "pops out all the time." (*Id.* at 6). Plaintiff did not try to reduce his hernia due to the pain. Plaintiff was encouraged to try to reduce the hernia, and a nurse called Dr. Shah. (*Id.*). The doctor prescribed Vicodin painkillers to be taken immediately and as needed for the following 24 hours. (*Id.*). Dr. Shah saw Plaintiff the next day in the infirmary. Plaintiff indicated that he was feeling better, his hernia reduced, and that the swelling was gone. (*Id.*). Dr. Shah discontinued Plaintiff's Vicodin, prescribed Ibuprofen, and discharged Plaintiff from the infirmary. (*Id.*).

Between May 6, 2013 and June 29, 2013 Plaintiff presented to medical providers on four or five occasions with complaints relating to his hernia. (*See id.* at 7 – 8). In this time period, Plaintiff had difficulty reducing his hernia, and on at least one occasion, could only reduce his hernia by bending his legs.

Sometime in October 2013, Plaintiff submitted a request to be seen by Assistant Warden Brucart regarding issues with his hernia and his eye. (Doc. 48-4, p. 30, 31). Plaintiff felt like he was not getting his medical needs met. (*Id.* at 30). During this meeting, Warden Brucart summoned Defendant Susan Kerr who was the Healthcare Unit Administrator ("HCUA") at Robinson. (*Id.*). During this meeting, Plaintiff stated that his hernia was getting unbearable and that he was unable to walk. (*Id.* at 32). According to Plaintiff, Defendant Kerr indicated there was nothing she could do as

Plaintiff was not getting surgery. (*Id.*).

As HCUA, Defendant Kerr is not involved in the approval or denial of surgical procedures. (Doc. 56-1, p. 1). Nor does she have the authority to override medical decisions made by doctors, to refer Plaintiff to an outside specialist, or to order surgical procedures where a doctor has not made such a referral or prescribed such a procedure. (*Id.* at 2).

On October 18, 2013, after complaining of constant stabbing and burning pain, along with his hernia protruding for four hours, Plaintiff was diagnosed with a strangulated hernia, and was sent to the emergency room. (*Id.*). Upon being examined at the ER, and after finally being able to reduce the hernia after an hour, a doctor explained that the hernia must be surgically repaired. (*Id.* at 66). The doctor's report stated, in part:

> I explained that this hernia simply must be repaired. He cannot continue to reduce this for hours at a time each week and he certainly is at risk for having to have an emergency operation and with anticoagulation because of his atrial fibrillation this simply cannot be allowed.

(*Id.*). Surgery was performed on October 24, 2013, and Plaintiff was found to have a large chronically thickened indirect inguinal hernia, with a small to medium sized cord lipoma. (*Id.* at 67).

### III. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions. The rule states that summary judgment is appropriate only if the admissible evidence considered as a whole shows there is no genuine issue as to any material fact

and the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED.R.CIV.P. 56(a)). The party seeking summary judgment bears the initial burden of demonstrating – based on the pleadings, affidavits and/or information obtained via discovery – the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr. Inc.*, 753 F.3d 676 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012); *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir. 2011); *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

IV. ANALYSIS

    a. **Defendant Kerr**

The Court first addresses Plaintiff's claim against Defendant Kerr, which alleges deliberate indifference to a serious medical need in violation of the Eighth Amendment. Prison officials violate the Eighth Amendment's proscription against "cruel and

unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) (stating that a prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards"); *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Although a prison official may not continue a course of treatment he knows is blatantly ineffective, prisoners are not entitled to receive unqualified access to healthcare. *See Holloway*, 700 F.3d at 1073-74. A doctor may provide the care he feels is reasonable so long as it falls within a "range of acceptable courses based on prevailing standards in the field." *Id.* at 1073.

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first prong is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it

could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** *Accord Farmer v. Brennan*, **511 U.S. 825, 828 (1994) (violating the** *Eighth Amendment* **requires "deliberate indifference to a** *substantial* **risk of** *serious* **harm.") (internal quotation marks omitted) (emphasis added).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652-53**.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff need not show the defendant literally ignored his complaint, just that the defendant was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).** Deliberate indifference is not negligence; rather it is more akin to intentional wrongdoing. *McGee v. Adams*, **721 F.3d 474, 480 (7th Cir. 2013).** The standard is criminal recklessness, and even gross negligence will not meet this standard. *Id.* **at 481**.

Plaintiff is unable to recover against Defendant Kerr. In order to be held liable on a section 1983 claim, a defendant must have been personally responsible for the plaintiff's injury. *Sanville v. McCaughtry*, **266 F.3d 724, 740 (7th Cir. 2001).** Although Kerr arguably showed indifference to Plaintiff's hernia, she was not responsible for any harm he suffered. As HCUA, Defendant Kerr had no authority to alter a doctor's

course of treatment and could not order Plaintiff referred to a specialist or order that he undergo surgery. Therefore, even if Defendant Kerr wanted to provide Plaintiff with surgery or some other differing course of treatment, there is nothing in the record to indicate that she had the authority to do so. As such, Defendant Kerr was not personally responsible for any harm suffered by Plaintiff, and summary judgment is appropriate as to her.

### b. Defendant Wexford

Plaintiff alleges that Wexford violated his rights by having a policy that elevated cost concerns over quality of care, to which its medical providers acted pursuant, resulting in the delay of proper medical care in violation of the Eighth Amendment. (Doc. 16, p. 5 – 6). The doctrine of *respondeat superior* does not apply in § 1983 cases, including as against corporate defendants. **Shields v. Illinois Dept. of Corr., 746 F.3d 782, 789 (7th Cir. 2014) (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982))**. In **Monell v. Dept. of Social Services of the City of New York,** however, the Supreme Court held that a municipality may be liable under § 1983 for constitutional violations resulting from a policy or custom of the municipality, **436 U.S. 658, 690 – 91 (1978)**. The Seventh Circuit has extended *Monell* beyond municipalities to include private corporations providing government services, such as Wexford. **See Shields, 746 F.3d at 789**. A corporation that has contracted to provide essential government services may be held liable under § 1983 for constitutional violations caused by unconstitutional policies or customs. *Id.*

Liability under *Monell* may be shown three ways. First, a plaintiff might

demonstrate that the unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Glisson v. Indiana Dept. of Corrections*, **849 F.3d 372, 379 (7th Cir. 2017) (quoting** *Los Angeles County v. Humphries*, **562 U.S. 29, 35 (2010))**. Second, the plaintiff might prove that a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'" *Glisson*, **849 F.3d at 379 (quoting** *Monell*, **436 U.S. at 690 – 91)**.

The final way a plaintiff may demonstrate liability pursuant to *Monell* is by demonstrating a widespread custom or practice. *Glisson*, **849 F.3d at 379**. Liability may extend to customs "so permanent and well settled as to constitute a custom or usage with the force of law" even though they received no formal approval. *Monell*, **436 U.S. at 91 (quoting** *Adickes v. S.H. Kress & Co.*, **398 U.S. 144, 167 – 68 (1970))**. Such a custom may be established by evidence of policymaking officials' knowledge and acquiescence to the unconstitutional practice. *McNabola v. Chicago Transit Authority*, **10 F.3d 501, 511 (7th Cir. 1993)**. Sufficient evidence may include proof that the practice was so "long standing or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'" *Id.* **(quoting** *Brown v. City of Fort Lauderdale*, **923 F.2d 1474, 1481 (11th Cir. 1991))**.

The Court finds that a jury could reasonably infer a widespread and well-settled unconstitutional practice on the part of Wexford and/or its doctors. The record allows for the reasonable inference that a practice existed such that surgery would not be approved for as long as possible as long as an inmate's hernia was reducible. The Court

does not find it unreasonable to infer that this practice by Wexford, a private company, existed for the purpose of cost savings.

This practice may be inferred for many reasons. First, for almost two years, from January 3, 2011 to November 16, 2012, Plaintiff presented to a prison healthcare provider regarding his hernia, and because Plaintiff's hernia was ultimately reducible each time, there was no deviation from the same conservative course of treatment. In addition, at two separate collegials, Plaintiff was denied a referral for a surgery even though the hernia was a longstanding problem and by Wexford's own admission, was the size of a tennis ball to a softball. One of the surgery denials came *after an outside specialist recommended surgery*. With each denial, it was referenced that Plaintiff's hernia was reducible.

After Plaintiff's second denial for surgery, he presented to healthcare roughly six times before he was ultimately approved for surgery. On one of these occasions, one of Plaintiff's testicles was swollen and another, a medical emergency existed and Plaintiff was in so much pain that he had to be placed on Vicodin. Yet, each time, his hernia was reducible, and still no surgery was approved. Surgery was not performed until an outside emergency room doctor stated that Plaintiff *must* have the hernia surgically repaired.

Additionally, though Plaintiff cannot recover against Defendant Kerr, her statement at the October 2013 meeting that Plaintiff was not getting surgery is evidence of the aforementioned policy. The fact that a healthcare administrator who is unable to make treatment decisions is aware that an inmate is not going to get a surgery for his

longtime problematic hernia is strong evidence of a common condoned practice among healthcare providers of not approving surgeries for reducible hernias.

There is also plenty of evidence to allow a jury to reasonably infer that this policy was well-settled, and that it was so widespread that even if not formally approved by Wexford policymakers, they had to have known about it and did nothing: Plaintiff was subjected to the same conservative treatment in the face of recurring and worsening problems for at least three years. Additionally, it cannot be said that the course of treatment to which Plaintiff was subjected was not the result of one or two isolated physicians at one facility. From September 2010 to October 2013, at least five different Wexford doctors at two separate prison facilities were involved in Plaintiff's care. Plaintiff's hernia was discussed at three separate collegials before October 2013 involving three different doctors and Plaintiff was not approved for a surgery.[1] There is no bright line rule that establishes what constitutes a widespread custom or practice, *Wilson v. Cook County*, **742 F.3d 775, 780 (7th Cir. 2014)**; however, the Court is confident that, here, the number of doctors involved and the fact that the consistent course of conservative treatment occurred at two separate prisons are both not only evidence of the policy itself, but also evidence a well-established and widespread policy.

There is also no doubt this policy was violative of the Eighth Amendment. A doctor engaging in a course of treatment known to be ineffective is evidence of

---

[1] Chief Judge Wood has aptly described the Wexford collegial process, where, in this Court's experience, it is the frequent case that "one doctor consults with a second and allows the second to override his recommendation." *Whiting v. Wexford Health Sources, Inc.*, **839 F.3d 658, 665 (7th Cir. 2016) (Wood, C.J. dissenting)**.

deliberate indifference. *See Greeno*, **414 F.3d at 655 (defendants' persistence in a course of treatment over a year and a half that was known to be ineffective was evidence of deliberate indifference) (citing** *Kelley v. McGinnis*, **899 F.2d 612 616 – 17 (7th Cir. 1990))**. In addition, refusing to follow the directions or recommendations of a specialist can also be evidence of deliberate indifference. *Perez v. Fenoglio*, **792 F.3d 768, 777 (7th Cir. 2015) (citing** *Arnett*, **658 F.3d at 753)**. Here, Wexford's practice of refusing to approve a hernia repair surgery as long as the hernia was reducible, flew in the face of Plaintiff's repeated pain and other problems, as well as, a recommendation from an outside specialist. A jury could easily infer that this practice was not based on the professional medical judgment of the physicians carrying it out. Though Plaintiff ultimately received surgery, it was in spite of, and not due to, Wexford, and there is no doubt, with the facts taken in Plaintiff's favor, that because of this practice Plaintiff suffered needless pain for an extended period of time. Wexford is not entitled to summary judgment.

V. CONCLUSION

As discussed above, though Defendant Kerr may have been indifferent to the pain and suffering from which Plaintiff was ailing, under section 1983, she has no personal responsibility. The Court has no choice but to **GRANT** Defendant Kerr's Motion for Summary Judgment. All claims against Defendant Kerr are **DISMISSED with prejudice**. At the close of the case, the Clerk of Court shall enter judgment for Defendant Kerr and against Plaintiff.

As for Wexford, however, a jury could infer an unconstitutional practice of not

approving hernia surgeries that was carried out by its physicians and condoned by policymakers. As such, Wexford's Motion for Summary Judgment is **DENIED**. Since this matter is now approaching trial, the Court will assign counsel to represent Plaintiff and will set this matter for a Status Conference.

    **IT IS SO ORDERED**.
    DATED: 3/30/2018

    */s/ Stephen C. Williams*
    STEPHEN C. WILLIAMS
    **United States Magistrate Judge**